*James Russell Trimble v. State of Maryland*, No. 28, September Term, 2024. Opinion by Eaves, J.

**MD. CODE ANN., CRIMINAL PROCEDURE § 8-110(d)(1) – CONSIDERATION OF AGE**

In considering a motion for reduction of sentence filed under § 8-110 of the Criminal Procedure Article ("CP") of the Annotated Code of Maryland (2018 Repl. Vol., 2024 Supp.), the circuit court has broad discretion to determine whether an individual is a danger to the public and whether the interests of justice will be served by a reduced sentence. When undertaking its dangerousness and interests-of-justice analysis under CP § 8-110(c), although the court is required to consider ten enumerated factors under CP § 8-110(d), as well as any other factor the court determines is relevant, the statute does not require that the court consider an individual's age at the time of the offense as a factor that supports a sentence reduction in every case.

**MD. CODE ANN., CRIMINAL PROCEDURE § 8-110(d)(5) – NO SPECIAL CONSIDERATION**

In considering a motion filed under CP § 8-110, the circuit court is not required to give special consideration to any particular factor under subsection (d), including whether the individual has demonstrated maturity, rehabilitation, and fitness to reenter society.

**MD. CODE ANN., CRIMINAL PROCEDURE § 8-110(d) – REVIEW OF DENIAL OF SENTENCE REDUCTION – NO ABUSE OF DISCRETION**

Concerning Mr. Trimble's case specifically, the circuit court did not abuse its discretion when it (1) effectively ruled that Mr. Trimble's age at the time of the crime (nearly 18 years old) was not a factor that advanced his request for a reduced sentence; (2) adequately considered all factors under CP § 8-110; and (3) did not credit Mr. Trimble's expert's testimony concerning his antisocial personality disorder diagnosis. The court carefully considered all of the evidence presented when evaluating each of the mandatory factors under CP § 8-110(d) and concluded that "the interests of justice would certainly not be served by ordering a reduced sentence."

Circuit Court for Baltimore County
Case No. 74841
Argued: February 6, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 28

September Term, 2024

---

JAMES RUSSELL TRIMBLE

v.

STATE OF MARYLAND

---

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough

JJ.

---

Opinion by Eaves, J.
Fader, C.J., Booth, and Killough, JJ., concur.

---

Filed: July 17, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

# I
# INTRODUCTION

From 2010 to 2016, the Supreme Court of the United States radically altered the legal landscape concerning juvenile offenders convicted as adults. In *Graham v. Florida*, the Supreme Court held that the Eighth Amendment precludes a sentence of incarceration for life without the possibility of parole for juveniles convicted of non-homicidal offenses.[1] While *Graham* does not require states "to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime[,]" states are required to provide juvenile offenders with "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."[2] Two years later, in *Miller v. Alabama*, the Supreme Court went a step further, holding that the Eighth Amendment prohibits "mandatory life-without-parole sentences for juveniles[.]"[3] Lastly, in *Montgomery v. Louisiana*, the Supreme Court held that its decision in *Miller* announced a new substantive constitutional rule that qualified for retroactive application on state collateral review.[4]

Against the backdrop of these cases, the Maryland General Assembly passed the Juvenile Restoration Act ("JUVRA").[5] JUVRA created two new statutes under the

---

[1] 560 U.S. 48, 74 (2010).

[2] *Id.* at 75.

[3] 567 U.S. 460, 470 (2012).

[4] 577 U.S. 190, 208–09 (2016).

[5] 2021 Md. Laws, ch. 61; *Malvo v. State*, 481 Md. 72, 101 (2022) ("Thus, as a general rule, JUVRA is likely to provide the 'meaningful opportunity for release' contemplated by the Supreme Court.").

Criminal Procedure Article ("CP") of the Annotated Code of Maryland: §§ 6-235 and 8-110 (2018 Repl. Vol., 2024 Supp.), both of which went into effect on October 1, 2021.[6] For minors convicted as adults after the effective date, CP § 6-235 eliminates a court's ability to impose a sentence of life without the possibility of parole, and also enables a court to impose a sentence less than any applicable statutory mandatory minimum.

CP § 8-110 authorizes individuals sentenced as minors prior to October 1, 2021, who have served at least 20 years' incarceration, to file a motion for a reduction of sentence.[7] Section 8-110 lists 10 enumerated factors that a court must consider, along with any other factor a court deems relevant,[8] to assist the court in ultimately determining whether the individual is not a danger to the public and whether a reduced sentence is in the interests of justice.[9] This case involves the JUVRA sentence modification provisions set forth in CP § 8-110.

James Russell Trimble, Petitioner, filed in the Circuit Court for Baltimore County a motion pursuant to CP § 8-110, seeking a reduction of sentence for his prior conviction of, among other crimes, first-degree murder. Mr. Trimble was approximately 17 years and 8 months old at the time of the offenses upon which the convictions were based. The circuit

---

[6] 2021 Md. Laws, ch. 61, § 2.

[7] CP § 8-110(a), (b)(1).

[8] *Id.* § 8-110(d).

[9] *Id.* § 8-110(c).

court denied relief, and the Appellate Court of Maryland affirmed.[10] We issued a writ of certiorari[11] to answer the following questions, which we have slightly rephrased:

1. Under CP § 8-110, is a court required to consider the individual's age at the time of the offense as a factor that weighs in favor of a reduction in sentence in every instance?

2. Under CP § 8-110, is a court required to give any particular factor, including whether the individual has demonstrated maturity, rehabilitation, and fitness to enter society, greater weight than any other factor?

3. Did the trial court correctly apply the factors in this case or abuse its discretion in refusing to credit testimony from Mr. Trimble's expert, Dr. Means, concerning Mr. Trimble's antisocial personality disorder ("ASPD") diagnosis?

For the reasons discussed below, we hold that, when considering whether to grant a motion for reduction of sentence under CP § 8-110, the General Assembly has conferred broad discretion upon the circuit court to determine whether an individual is not a danger to the public and whether the interests of justice will be served by a reduced sentence. When undertaking its dangerousness and interests-of-justice analysis under CP § 8-110(c), the court is required to consider ten enumerated factors under CP § 8-110(d), as well as any other factor the court determines is relevant. The statute does not require that the court: (1) consider an individual's age at the time of the offense as a factor that supports a sentence

---

[10] *Trimble v. State*, 262 Md. App. 452, 457, 473 (2024).

[11] *Trimble v. State*, 489 Md. 196 (2024).

3

reduction in every case; or (2) give greater weight to any particular factor. In this case, we hold that the court, in denying Mr. Trimble's motion for a reduction of sentence, adequately considered each factor, provided critical facts and reasons supporting its dangerousness and interests-of-justice analysis, and that those facts and reasons were supported by the record. We, therefore, affirm the judgment of the Appellate Court.

**II**
**BACKGROUND**

We first discuss the statute at issue, CP § 8-110. We then recount the facts underlying Mr. Trimble's conviction and relevant portions of his original sentencing, before discussing the motion that is the subject of this appeal.

*A.*     *CP § 8-110*

Before an individual can file a motion under CP § 8-110, the individual must meet three eligibility criteria. The individual must have been: (1) a minor at the time the crime underlying a conviction was committed; (2) sentenced before October 1, 2021; and (3) incarcerated for at least 20 years. CP § 8-110(a). If an individual is eligible and files such a motion, the circuit court is required to conduct a hearing, which the movant has a right to attend, and both the movant and the State have a right to introduce evidence. *Id.* § 8-110(b)(2)–(4). Notice of the hearing also must be provided to a victim or a victim's representative as set forth in CP §§ 11-104 and 11-503. *Id.* § 8-110(b)(5).

A circuit court can reduce a movant's sentence *only* if the court finds that two criteria are satisfied: "(1) the individual is not a danger to the public[] and (2) the interests

4

of justice will be better served by a reduced sentence." *Id.* § 8-110(c). These are the ultimate criteria that a movant must establish to be entitled to a reduced sentence.

The General Assembly has directed that, in determining whether these two criteria have been met, a circuit court "shall consider the following factors[:]"

(1) the individual's age at the time of the offense;

(2) the nature of the offense and the history and characteristics of the individual;

(3) whether the individual has substantially complied with the rules of the institution in which the individual has been confined;

(4) whether the individual has completed an educational, vocational, or other program;

(5) whether the individual has demonstrated maturity, rehabilitation, and fitness to reenter society sufficient to justify a sentence reduction;

(6) any statement offered by a victim or a victim's representative;

(7) any report of a physical, mental, or behavioral examination of the individual conducted by a health professional;

(8) the individual's family and community circumstances at the time of the offense, including any history of trauma, abuse, or involvement in the child welfare system;

(9) the extent of the individual's role in the offense and whether and to what extent an adult was involved in the offense;

(10) the diminished culpability of a juvenile as compared to an adult, including an inability to fully appreciate risks and consequences; and

(11) any other factor the court deems relevant.

*Id.* § 8-110(d).

5

The court's decision to grant or deny the motion must be made in writing and must address all factors. *Id.* § 8-110(e). If a movant is not completely successful on their motion, i.e., if the court either denies or partially grants the motion, then the movant may pursue relief under CP § 8-110 only twice more, but they must wait three years between each successive filing. *Id.* § 8-110(f).

## B.    *Underlying Conviction and Sentencing*

In 1982, Mr. Trimble was convicted of first-degree murder, first degree rape, two counts of first-degree sexual offense, two counts of kidnapping, and one count of sexual assault. In a prior appeal, this Court stated the facts underlying Mr. Trimble's convictions as follows:

> On July 3, 1981, Melanie Rae Newsom and the murder victim, Nila Kay Rogers, were invited by a friend from school to ride around in a van with some of his friends. The two women entered the van with the friend, James Hanna. Inside were [Mr.] Trimble, Terry Evans, Joseph Evans and Anthony Kordell. The Evans brothers, [Mr.] Trimble[,] and Kordell had earlier taken various drugs and drunk beer.
>
> After [Ms.] Newsom and [Ms.] Rogers entered the van, [Mr.] Trimble tried to kiss [Ms.] Newsom. She resisted. He screamed and began to tear off her clothing. [Ms.] Rogers tried to stop him, but [Mr.] Trimble punched her and threw her in the back of the van. He then hit [Ms.] Newsom and forced her to commit fellatio. The two women persuaded the men to stop the van. Hanna and [Ms.] Newsom went into a cornfield. Back in the van[, Mr.] Trimble and Joseph Evans raped [Ms.] Rogers. As Kordell tried to pull [Ms.] Rogers out of the van, [Mr.] Trimble repeatedly struck her with a baseball bat. [Mr.] Trimble then dragged her into [a] cornfield and slit her throat from ear to ear. He left her body in the cornfield where she was later pronounced dead. The cause of death was listed as severe head injuries from a blunt object.

*Trimble v. State*, 321 Md. 248, 253 (1990).

At trial, Mr. Trimble offered insanity as his only defense. The State called Dr. Michael K. Spodak,[12] an expert in the field of forensic psychology. Dr. Spodak testified that Mr. Trimble suffered from a history of substance abuse but that he did not lack substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law under the then-prevailing insanity standard. Another State expert concurred. *Id.* at 253. The only defense witness was a doctor who testified that Mr. Trimble's afflictions caused him to lack substantial capacity to conform his conduct to the law, but the doctor declined to state that conclusion to a reasonable degree of medical certainty or probability. *Id.*

The jury rejected Mr. Trimble's insanity defense and found him guilty. Mr. Trimble waived his right to be sentenced by a jury and he was instead sentenced by the court. *Id.* at 262. During the original sentencing phase, the State called Dr. Spodak to testify about Mr. Trimble's ASPD diagnosis, which Dr. Spodak characterized as "severe." This characterization matched the diagnosis of Dr. Robert B. Lehman, another psychiatrist who evaluated Mr. Trimble before trial while he was a patient at Clifton T. Perkins Hospital. Dr. Spodak described ASPD as a type of disorder that is "deeply ingrained," and "life-long[]" and testified that it is "very unlikely, if possible at all, that [ASPD] could ever be altered by therapy." Dr. Spodak noted, however, that modest improvements could be made,

---

[12] Dr. Spodak met with Mr. Trimble a total of four times to evaluate him, as Mr. Trimble's defense at trial was that he was not criminally responsible by way of insanity.

such that one might eventually "conform to jail rules[.]"[13]

Although ASPD was, and currently is, listed in the Diagnostic and Statistical Manual of Mental Disorders ("DSM"),[14] Dr. Spodak discussed its uniqueness in that ASPD is "lumped under a mental disorder by virtue of the fact that it's in the DSM-3, but it's more motivation or behavior, not a disorder of the nature that has symptoms, a set treatment, course of recovery from, and so on." In other words, Dr. Spodak explained, ASPD presents not so much in terms of "symptoms of a mental illness," but rather "it's a description of how [one] gets along in life."

Dr. Spodak testified that, given Mr. Trimble's ASPD diagnosis, he was a danger to society. Particularly, Dr. Spodak highlighted Mr. Trimble's inability to: (1) "see that [what] he [then was] doing [was] wrong[;]" (2) "learn from his past mistakes[;]" (3) "conform[] to society's norms[;]" (4) form a "consistent life plan[;]" and (5) have "guilt or remorse[]" for his convictions. Dr. Spodak also noted that Mr. Trimble exhibited "sadistic behavior."

---

[13] While Dr. Spodak acknowledged that as one with ASPD ages (say into their forties or fifties) participation in criminal behavior may be less frequent, he tied that decrease in criminal behavior to "practical" reasons, such as a physical inability to engage in such conduct or a lack of opportunities to engage in truant behavior (as one might previously have in school). Nevertheless, Dr. Spodak believed that other characteristics, such as an inability to feel remorse, the lack of a conscience, and inability to form a life plan all "tend [not] to change."

[14] "The DSM is a publication for the classification of mental disorders that is periodically revised." *Williams v. Kincaid*, 45 F.4th 759, 781 (4th Cir. 2022) (Quattlebaum, J., concurring in part and dissenting in part). At the time of sentencing, the DSM-3 was in use. At the time of Mr. Trimble's hearing on his motion filed under CP § 8-110, the DSM, Fifth Edition, Text Revision (DSM-5-TR) was in use. *See* American Psychiatric Association, *APA Releases Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (DSM-5-TR)* (Mar. 18, 2022) (https://www.psychiatry.org/News-room/News-Releases/APA-Releases-Diagnostic-and-Statistical-Manual-of).

This led Dr. Spodak to conclude that Mr. Trimble would repeat his conduct "without the slightest hesitation[.]"

Mr. Trimble was sentenced to death. *Trimble*, 321 Md. at 254. This Court upheld his conviction and sentence on direct appeal, *Trimble v. State*, 300 Md. 387, 393, 437 (1984), but later vacated his death sentence after concluding he was improperly advised of his right to be sentenced by a jury. *Trimble*, 321 Md. at 264. On remand, Mr. Trimble was resentenced to a consecutive life sentence that was upheld on appeal. *Trimble v. State*, 90 Md. App. 705, 709 (1992).[15]

## C. *Motion to Correct an Illegal Sentence*

In December 2019, Mr. Trimble filed a Motion to Correct an Illegal Sentence pursuant to Maryland Rule 4-345(a) and *Carter v. State*, 461 Md. 295 (2018).[16] Mr. Trimble argued that three consecutive life sentences and 40 years' incarceration—imposed on him for crimes he committed as a minor—were unconstitutional under both the Eighth Amendment to the United States Constitution and Articles 24 and 25 of the Maryland Declaration of Rights. In March 2021, the circuit court held a hearing on this motion, at

---

[15] Between Mr. Trimble's original sentencing and the granting of post-conviction relief, the General Assembly abolished the death penalty for juvenile offenders found guilty of first-degree murder, instead requiring the imposition of a life sentence. 1987 Md. Laws, ch. 626 § 1. During Mr. Trimble's resentencing, the court imposed a life sentence.

[16] In *Carter v. State*, we held that consecutive maximum sentences for various assault convictions, totaling 100 years, where the defendant would not be parole eligible for at least 50 years, was "tantamount to a sentence of life without parole." 461 Md. 295, 365 (2018). Thus, that collective sentence was unconstitutional under the Eighth Amendment. *Id.*

which time Mr. Trimble introduced written and oral testimonial evidence.[17] The following month, however, before the circuit court issued a ruling on the motion to correct an illegal sentence, Mr. Trimble moved to withdraw it without prejudice to pursue relief under CP § 8-110, which had been enacted (although not yet in effect) about one week earlier. The court reserved on the motion to withdraw in an April 29, 2021, order.

**D.     *JUVRA Motion for Sentence Reduction***

In February 2022, Mr. Trimble filed a motion under CP § 8-110 that is the subject of this appeal. The circuit court held a hearing on the motion in October 2022. To demonstrate to the court that he was deserving of a reduced sentence, Mr. Trimble discussed six areas of his life that he believes exhibit how the "recklessness that once dominated [his] troubled youth has long since subsided." At the hearing, Mr. Trimble had various character witnesses testify on his behalf,  as well as a licensed clinical social worker and a community engagement coordinator. We briefly recount that evidence presented, focusing on the evidence that is germane to the allegations of error that Mr. Trimble presents to this Court.

In addition to an updated mental health evaluation, which we discuss below, Mr. Trimble presented evidence that focused on his: (1) institutional adjustment, which indicated that he has remained infraction-free since 1999, has had success with counseling and treatment (expressing a desire to apologize to those affected by his crimes), and has obtained the equivalent of a high school diploma and a Bachelor's degree in Applied

---

[17] This evidence was made part of the record for Mr. Trimble's motion, filed under CP § 8-110, some of which we discuss in more detail below.

Psychology from Coppin State College; (2) institutional employment, which includes various jobs within the Department of Corrections ("DOC") and praise received from supervisors; (3) participation in rehabilitative programming; (4) successful abstinence from drugs and alcohol; and (5) support network, which includes various individuals in his life who would offer support were he to be released based on a sentence reduction.[18]

Most critically, Mr. Trimble submitted a May 2020 medical evaluation and report prepared by Psychiatrist Ronald Means, which had been submitted to the court for consideration in relation to the prior motion to correct an illegal sentence. Dr. Means had testified at the prior hearing, and both Dr. Means' report and his prior testimony were introduced into evidence at the hearing on Mr. Trimble's CP § 8-110 motion. Relying on that report and testimony, Mr. Trimble asserted that his diagnosis of ASPD "is no longer applicable."

Dr. Means noted that ASPD is a disorder "characterized by a pervasive pattern of disregard for and violation of the rights of others[]" and that it is "a set pervasive diagnosis that has little resolution." According to Dr. Means:

> ASPD is diagnosed when a person exhibits a pervasive pattern of disregard for and violation of the rights of others occurring since age 15 as manifested by failure to conform to social norms with respect to lawful behaviors, deceitfulness, impulsivity, irritability, aggressiveness, reckless disregard for safety of self or others, repeated failure to sustain consistent work behavior or honor financial obligations and a lack of remorse.

> Dr. Means also explained the complex nature of ASPD and how that diagnosis is in

---

[18] Counsel for Mr. Trimble at the motions hearing also indicated that, should Mr. Trimble be released, there was a "release plan in place[.]"

tension with the current understanding of juvenile brain development. For instance, Dr. Means believes that when Mr. Trimble was diagnosed with ASPD at age 18, Mr. Trimble "met [the] criteria for that diagnosis[]" as noted above and that if he (Dr. Means) "saw Mr. Trimble [today, he] would probably – at the age of 18, . . . make the same diagnosis." Dr. Means noted, however, that while contemporary science still permits a diagnosis of ASPD as early as age 18, "there is a bit of discrepancy[] . . . between that time where you say you can make this diagnosis that is generally perceived as something that can be very fixed versus what we know about when the brain reaches full maturation[,]" which, as Dr. Means noted, is recognized as being in a person's mid to late 20s. Thus, Dr. Means qualified his opinion that he too would have diagnosed Mr. Trimble at age 18 with ASPD by saying that "despite the fact [that] I'm making this diagnosis at 18, there is – the fixed nature of this diagnosis is less so because he is so young and he will have ongoing maturation for many years to come."

In his report, Dr. Means noted that, after Mr. Trimble transitioned into full adulthood,

> Mr. Trimble demonstrated few examples of [ASPD] behavior. His progression provides further evidence of what is now known regarding the development of transitional aged youth. There is ongoing brain maturation until the mid-twenties that results in tremendous shifts in the ability to think comprehensively. What was thought to be a certain, set pattern of criminality proved to be a temporary state that resolved. Mr. Trimble has not demonstrated evidence of ASPD for the vast majority of his adult life.

To support that opinion, Dr. Means noted that Mr. Trimble "has abstained from drugs and alcohol for over [30] years[]" and that Mr. Trimble's institutional records show a "notable shift in [his] behavior and demeanor, roughly corresponding to the time his death sentence

12

was reversed." Examining Mr. Trimble's rehabilitative efforts in prison, including Mr. Trimble's educational achievements and various institutional jobs, would lead to the conclusion that Mr. Trimble "is not incorrigible." Instead, Dr. Means believes that Mr. Trimble's "progression provides further evidence of what is now known regarding the development of transitional-aged youth." In other words, that there is "brain maturation until the mid-twenties that results in tremendous shifts in the ability to think comprehensively."

Because Dr. Means believes that Mr. Trimble "has not demonstrated evidence of [ASPD] for the vast majority of his adult life," Dr. Means opined that, "to a reasonable degree of medical certainty, if allowed to be released from prison, it is most probable that Mr. Trimble will have success in the community."

In response to Mr. Trimble's motion, the State submitted a response requesting that the court deny Mr. Trimble's motion for a reduced sentence. After recounting the details of Mr. Trimble's convictions, the State highlighted many of Mr. Trimble's unsavory acts during trial and shortly thereafter. For example, the State recounted that Mr. Trimble was "an avowed admirer of Charles Manson[ and] appeared in court with his head shaved and an 'X' marked on his forehead." The State informed the court that, during trial, Mr. Trimble would disrupt proceedings by "sticking his tongue out in a lizard[-]like fashion, twirling around in his chair and burping at the guard." Mr. Trimble also exhibited disrespect toward Ms. Newsom during her testimony by sticking his tongue out at her, as well as waving to and smiling at Ms. Newsom's sister. Roughly three months after trial concluded, Mr. Trimble sent a letter intended for Ms. Rogers' father, in which Mr. Trimble used vile

language to describe Ms. Rogers and graphically described the acts he committed against her. The State also discussed how Mr. Trimble's own expert, in support of Mr. Trimble's insanity defense, indicated how Mr. Trimble had previously attacked his own girlfriend on multiple occasions and "enjoyed discussing sadistic pursuits, [such as] smashing turtles, [and] drowning and electrocuting cats[.]" This expert further noted that "guilt and remorse [were] not a part of Mr. Trimble's personality."

The State was not persuaded by Dr. Means' assessment that Mr. Trimble's ASPD diagnosis had not been present for the vast majority of Mr. Trimble's life, given that Mr. Trimble—at age 38—requested that Ms. Rogers' body be exhumed for further DNA testing. In the State's view,

> it is impossible to reconcile the asserted [CP § 8-110] factors which [Mr. Trimble] feels are in his favor with the fact that [he] was only four months from his eighteenth birthday at the time of the offenses, the outrageously brutal nature of the offenses and the impact of his crimes on the victim and society.

Thus, the State believes that it would be "impossible" for the court to find that Mr. Trimble is not a danger to the public and that the interests of justice would be better served by a reduced sentence.

After the hearing, the court issued its written decision denying Mr. Trimble's motion. After recounting the facts and procedural history of Mr. Trimble's case, the court addressed all 10 statutory factors enumerated in CP § 8-110(d).

As to the first factor—the defendant's age at the time of the offense—the court stated that "[Mr.] Trimble was three or four months shy of his 18th birthday at the time of the killing of [Ms.] Rogers. This factor weighs against reducing the sentence."

14

The second factor requires that the court consider the history and characteristics of the movant. The court explained in detail the horrific facts, describing it as "one of the most brutal, savage crimes in the modern history of cases tried in the Circuit Court for Baltimore County." It discussed Mr. Trimble's background at length and credited evidence drawn from Mr. Trimble's psychological evaluations indicating that he suffered from ASPD as a permanent condition. It found that this factor weighed against sentence reduction.

With respect to the third factor—whether the individual has substantially complied with the rules of the institution in which the individual was confined—the court found that Mr. Trimble had substantially complied with the rules of the DOC.

The fourth factor requires that the court consider whether the movant has completed an educational, vocational, or other program. The court acknowledged that Mr. Trimble had obtained his GED and had graduated from Coppin State University with a degree in Applied Psychology.

Regarding the fifth factor, the court is required to consider whether the individual has demonstrated maturity, rehabilitation, and fitness to reenter society sufficient to justify a sentence reduction. The court stated "[Mr.] Trimble is not fit to reenter society. It is not logically possible to conclude that someone diagnosed with [ASPD], an organic, lifelong, chronic disorder characterized by deceitfulness and lack of remorse, has mystically gotten better over time." The court also emphasized that Mr. Trimble made a "ghastly request" to exhume Ms. Rogers' body for DNA evidence in 2002, and thus demonstrated a lack of

15

"legitimate sincere remorse" and a "fail[ure] to conform to social norms with respect to lawful behaviors."

As for the sixth factor—any statement offered by the victim or the victim's representative, the court quoted at length from the written impact statement of the victim's sister, which was placed in evidence by the State. The court found that the rape and killing had a deep, life-changing effect on the victim's family. It thus concluded that this factor weighed heavily against sentence reduction.

Under the seventh factor, the court is required to consider a report of a physical, mental, or behavioral examination of the individual conducted by a health professional. The court found that this factor weighed against sentence reduction, emphasizing:

> [Mr.] Trimble has been diagnosed by every psychiatrist involved in this case over the years as having [ASPD], previously referred to as psychopathy, sociopathy, or dissocial personality disorder, according to the Diagnostic and Statistical Manual of Mental Disorders (DSM-5-TR).
>
> *          *          *
>
> While studies suggest that the remission of [ASPD] conduct can occur as the person ages, it would appear as though even modern authorities agree with Drs. Spodak, Blumberg[19] and Lehman that this disorder is so deeply ingrained that rehabilitation/remission does not ordinarily occur. "For most people [ASPD] is a chronic disorder that begins in early childhood and continues throughout adulthood." The Natural History of Antisocial Personality disorder, Donald W. Black M.D. https://www.nebi.mlm.hih.gov (2015) (p. 8 of 11). [ASPD] subjects are manipulative and deceptive. They are incapable of experiencing legitimate remorse for criminal conduct, as conceded by Dr. Means.

---

[19] Dr. Neil Blumberg was one of the State's two psychiatric experts who testified at trial.

16

The court also noted that Mr. Trimble's own expert, Dr. Means, conceded that Mr. Trimble fit the description of someone affected by ASPD (also known as sociopathy). The court acknowledged Dr. Means' opinion that Mr. Trimble's ASPD has not persisted. Yet—having earlier observed that the court was entitled to "believe all part or none of Dr. Means' opinions"—the court rejected Dr. Means' opinion on this point, finding itself "not persuaded that [Mr.] Trimble's disorder has remitted significantly or that, if it has, the risk of extraordinary violence has abated."

Concerning the eighth factor—the individual's family and community circumstances at the time of the offense, including any history of trauma, abuse, or involvement in the child welfare system—among other things, the court cross-referenced its discussion of the second factor and Mr. Trimble's history of deceitfulness and uncorroborated self-reports of child trauma. It found that this factor did not weigh in favor of sentence modification.

The ninth factor directs the court to consider the extent of the individual's role in the offense and whether and to what extent an adult was involved in the offense. The court noted that the evidence showed that Mr. Trimble had a leading role in committing the crime and, shortly after being convicted, sent a letter to the victim's father. In the letter, Mr. Trimble taunted the father and bragged in lurid detail about having raped and murdered his daughter. The court found that the ninth factor weighed heavily against sentence modification.

Under the tenth factor, the court must account for the diminished culpability of a juvenile as compared to an adult, including an inability to fully appreciate risks and

17

consequences. The court noted that it had fully considered the relevant case law. It found

that this factor weighed against sentence reduction:

> There is no evidence, or even a suggestion in this case . . . that [Mr.] Trimble did not think consequentially at the time of this occurrence. In fact, the last line of the letter he wrote to [Rogers'] father ("The best part is I got of [sic] scott free and there's nothing you or anyone can do about it . . . .") can reasonably be interpreted to mean that Trimble did think consequently [sic] – that his experience of never having been held accountable for crimes he committed as a juvenile, would mean that he would not be held accountable for Nila Rogers' rape, kidnapping and murder. The fact that he was wrong about that does not mean he did not think consequently [sic]. To the contrary, an almost-18 year old who has never been held to account for "ten breaking and entering crimes, a handgun violation[,] an assault, and several drug arrests[,]" may well have reasonably concluded that he would not suffer consequences for this conduct either.

The court did not consider any additional factors. Having reviewed all the

enumerated factors, the court determined that "[Mr.] Trimble continues to present a

substantial risk to the public if released" and that "the interests of justice would not be

served by ordering a reduced sentence." It therefore denied Mr. Trimble's motion.

### E.     *The Appellate Court of Maryland*[20]

In a reported opinion, the Appellate Court of Maryland affirmed the circuit court's

---

[20] In its brief in the Appellate Court, the State also moved to dismiss Mr. Trimble's appeal, arguing that the Appellate Court lacked subject matter jurisdiction because "the denial of a motion to modify under CP § 8-110 is not reviewable unless the circuit court denied the motion on the grounds that it lacked the authority to modify the sentence." Primarily relying on our opinion in *Hoile v. State*, 404 Md. 591, 612–18 (2008), the Appellate Court held that Mr. Trimble's primary allegations were questions of law— namely that the circuit court improperly interpreted and applied CP § 8-110—and the court therefore had jurisdiction over Mr. Trimble's appeal. *Trimble*, 262 Md. App. at 473. Maryland courts have not squarely addressed whether defendants have a right to appeal generally from any order denying a motion for reduction of sentence under JUVRA. We have, however, previously explained that there is a distinction between a sentence based upon an error of law and a sentence that is based upon a matter entirely committed to the

denial of Mr. Trimble's CP § 8-110 motion. *Trimble v. State*, 262 Md. App. 452, 457 (2024). Regarding the first factor, the movant's age at the time of the offense, the Appellate Court held that "[n]othing in CP § 8-110 indicates that a court must only consider the movant's age as a mitigating factor." *Id.* at 469. To interpret the first factor as one that always must be weighed in a defendant's favor would, in the Appellate Court's view, create a superfluity in the requirements of CP § 8-110(a)(1). *Id.*

Turning to the issue of whether the court is required to give any particular factor more weight than another, the court held that no one factor is entitled to greater weight than another and that the statute merely requires the circuit court to consider all the factors and put its decision in writing. *Id.* at 465–66. The Appellate Court rejected Mr. Trimble's attempt to analogize CP § 8-110 to other statutes that this Court *has held* require greater weight for one factor over another. *Id.* at 462–63.

Lastly, concerning whether the circuit court misunderstood the medical evidence pertaining to Mr. Trimble's ASPD diagnosis and the other evidence concerning his rehabilitation, the Appellate Court likewise rejected Mr. Trimble's arguments. In the Appellate Court's words:

> [Mr.] Trimble believes that the court reached an incorrect conclusion regarding his rehabilitation and misunderstood his ASPD diagnosis. However, the circuit court has great discretion in considering a JUVRA motion to reduce a sentence, particularly where there is conflicting evidence. "Weighing the credibility of witnesses and resolving any conflicts in the evidence are tasks proper for the fact finder." *State v. Smith*, 374 Md. 527,

---

circuit court's discretion. *See Hoile*, 404 Md. at 617. The State has not renewed its motion to dismiss, and we agree that our analysis in *Hoile* controls. We need not decide whether an individual has a right to appeal an order denying a motion for reduction of sentence under CP § 8-110 when that appeal does not involve questions of law.

533–34 (2003) (quoting *State v. Stanley*, 351 Md. 733, 7503 (1998)). "We give 'due regard to the [fact finder's] finding of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses.'" *Moye v. State*, 369 Md. 2, 12 (2002) (quoting *McDonald v. State*, 347 Md. 452, 474 (1997)).

Given the discretion owed to the circuit court in weighing conflicting evidence and making findings of fact, we conclude the circuit court made no error in its consideration of the evidence surrounding the demonstrated maturity and rehabilitation factor. The record contains evidence of [Mr.] Trimble's diagnosis, scientific studies about ASPD and its longevity, and how they relate to whether [Mr.] Trimble may be fit to reenter society. The circuit court was entitled to weigh that evidence as it saw fit. Despite [Mr.] Trimble's argument that the court did not meaningfully consider [Mr.] Trimble's rehabilitation, the court did consider the evidence presented to it and decided that when viewed in conjunction with [Mr.] Trimble's ASPD diagnosis, the evidence of [Mr.] Trimble's purported rehabilitation did not support reducing his sentence.

*Id.* at 471–72 (second alteration in original).

## III
## STANDARD OF REVIEW

We undertake a de novo review when we are asked to consider matters of statutory interpretation. *See Davis v. State*, 474 Md. 439, 451 (2021); *State v. Thomas*, 465 Md. 288, 301 (2019).

Under JUVRA, the decision to grant or deny a motion for reduction of sentence under CP § 8-110 generally rests in the discretion of the circuit court upon consideration of the enumerated factors. Even under that standard of review, "the circuit court's discretion is tempered by the requirement that the court apply the 'correct legal standards[.]'" *Sexton v. State*, 258 Md. App. 525, 541 (2023) (alteration in original) (quoting *Faulkner v. State*, 468 Md. 418, 460–61 (2020)). "Where a trial court fails to do so, it abuses its discretion." *Faulkner*, 468 Md. at 461.

20

Absent an indication that the trial judge misstated or misapplied the applicable legal principles, we presume that trial judges know the law and apply it properly. *See, e.g.*, *State v. Chaney*, 375 Md. 168, 183–84 (2003). Appellate courts are "reluctant to find error" and to opine "that the [trial] judge misperceives the law, unless persuaded from the record that a judge made a misstatement of the law or acted in a manner inconsistent with the law." *Medley v. State*, 386 Md. 3, 8 (2005). The presumption of correctness, however, can be overcome where the trial judge's statements, "taken at face value, evince[] an incorrect understanding of the relevant law." *Id.* at 10. Typically, an appellate court "will not attribute to the words of a [trial] court's opinion or order a sense beyond the plain meaning of language appearing in the record, unless the context supports a different reading." *Id*.

On review of matters arising from a circuit court's evidentiary hearing, we exercise clear error deference to the court's first-level findings, including the resolution of conflicts in evidence, credibility determinations, and determinations about relative evidentiary weight. *See, e.g.*, *Brown v. State*, 452 Md. 196, 208 (2017) ("[The Court] accept[s] the suppression court's first-level findings unless they are shown to be clearly erroneous."); *Longshore v. State*, 399 Md. 486, 498 (2007) ("[W]hen there is a conflict in the evidence, an appellate court will give great deference to a hearing judge's determination and weighing of first-level findings of fact. It will not disturb either the determinations or the weight given to them, unless they are shown to be clearly erroneous."). Discretion connotes the authority to choose between alternatives. Accordingly, a trial court's discretionary ruling will not be disturbed "simply because the appellate court would not have made the same ruling." *Devincentz v. State*, 460 Md. 518, 550 (2018) (quoting *North v. North*, 102

21

Md. App. 1, 14 (1994)). "An abuse of discretion occurs where no reasonable person would take the view adopted by the circuit court." *Montague v. State*, 471 Md. 657, 673 (2020) (quoting *Williams v. State*, 457 Md. 551, 563 (2018)) (citation modified). Or stated another way, an abuse of discretion occurs when a ruling is "well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable." *Faulkner*, 468 Md. at 460 (quoting *King v. State*, 407 Md. 682, 697 (2009)).

On the issue of how an appellate court should construe a court's written decision concerning a motion for sentence reduction, we find the District of Columbia's approach to analyzing its equivalent to CP § 8-110 to be instructive. That is, "a trial court is not obligated to recount every detail of its preceding analysis, ultimately resolve every dispute of fact, or restate the weight ascribed to every factor." *Bishop v. United States*, 310 A.3d 629, 648 (D.C. 2024). Rather, so long as the written decision demonstrates that the court adequately considered each of the ten enumerated factors, and any other factor that the court determined was relevant, and "clearly states the critical facts and reasons supporting its dangerousness and interests-of-justice analyses, and those facts and reasons are supported by the record," the court will not have abused its discretion. *Id.*; *see also Beales v. State*, 329 Md. 263, 273 (1993) (explaining that trial judges have no obligation "to spell out in words every thought and step of logic[]" when announcing the reasons for their decisions).

# IV
# ANALYSIS

In this case, Mr. Trimble asserts that the circuit court erred in three respects. First, he contends that the court misapplied CP § 8-110(d)(1) when it found that Mr. Trimble's age at the time of the offense weighed against granting his motion for sentence reduction. Second, he contends that the circuit court misapplied CP § 8-110(d)(5) by not attributing sufficient weight to his rehabilitation evidence. Third, he argues that the court misunderstood and gave undue weight to his ASPD diagnosis. With respect to Mr. Trimble's first two assertions of error, he argues that the circuit court's application of the factors under CP § 8-110(d) is inconsistent with the plain language of the statute and its purpose. The third assertion of error involves the circuit court's exercise of its discretion in analyzing the evidence presented. Before we address Mr. Trimble's specific assertions of error, we first discuss some key features of JUVRA's sentence reduction scheme.

## A. *The Circuit Court's Broad Discretion When Considering a Motion for Reduction of Sentence Under JUVRA*

The General Assembly enacted CP § 8-110 as part of JUVRA to provide "another avenue for release" to juvenile offenders sentenced as adults "who can demonstrate maturity and rehabilitation following a substantial period of incarceration." *Jedlicka v. State*, 481 Md. 178, 182–83 (2022) (footnote omitted). The circuit court has the authority to modify a sentence if the court determines that: (1) the individual is not a danger to the public; and (2) the interests of justice are better served by a reduced sentence. CP § 8-110(c). In making this assessment, the General Assembly has enumerated ten factors that the court must consider, in addition to any other factor the court determines to be relevant.

23

CP § 8-110(d). We, thus, assess the plain meaning of "the interests of justice" and the overall statutory scheme.

### 1. The "interests of justice"

In reviewing the text of the JUVRA sentence reduction provisions, we first observe that the General Assembly did not displace the trial court's broad discretion in the sentencing context. Rather, the General Assembly simply requires that the trial court consider enumerated factors when exercising its broad discretion to grant or deny a JUVRA motion for sentence reduction. The General Assembly's intent to retain the court's broad authority is reflected in the text of subsection (c)—the required conditions that must be satisfied in order for a movant to obtain a sentence reduction. Specifically, the trial court must determine not only that the individual is no longer dangerous, but *also* that the sentence reduction is in the "interests of justice." CP § 8-110(c)(2). "The interests of justice" has been defined as "the proper view of what is fair and right in a matter in which the decision-maker has been granted discretion." Black's Law Dictionary (12th ed. 2024). The use of this open-ended phrase reflects the broad discretion that is vested in the trial court to determine what is fair and right, provided that in so doing, it considers the enumerated factors.

### 2. "Any other factor"—the catch-all

In addition to the ten enumerated factors, as noted above, the General Assembly expressly authorized the court to consider "*any other factor* the court deems relevant." CP § 8-110(d)(11) (emphasis added). This catch-all provision is broad and open-ended. The only limiting principle supplied by the General Assembly is relevance. *See* Md. R. 5-401

24

("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

In other statutory contexts involving the General Assembly's delegation of authority, we have interpreted the scope of the phrase "any other" as conferring "broad" discretion. *Cf. In re the Petition of the Md. Off. of People's Couns.*, 486 Md. 408, 444 (2024) (describing as "broad" a statutory provision granting the Public Service Commission discretion to consider "any other issues that it considers relevant to the assessment of acquisition in relation to the public interest, convenience, and necessity" (citation modified)). We apply the same construction here. That is, we apply the ordinary meaning of the phrase "any other," which reflects the General Assembly's intention to confer broad discretion on the court to consider *any* matter as long as it is relevant to the ultimate determination in granting a sentence reduction—that "(1) the individual is not a danger to the public; and (2) the interests of justice will be better served by a reduced sentence." CP § 8-110(c).

By its express terms, the General Assembly's use of the open-ended phrase "any other factor" also is consistent with this Court's description of the sentencing court's "very broad latitude" and "virtually boundless discretion" in deciding what factors to consider in rendering sentencing decisions. *See Jennings v. State*, 339 Md. 675, 683 (1995) (second quotation quoting *State v. Dopkowski*, 325 Md. 671, 679 (1992)).

***B.***     ***A Circuit Court Judge Is Not Required to Find that a Movant's Age Is a Factor Favoring a Sentence Reduction***

Mr. Trimble asserts that a circuit court is required to consider a movant's age as a factor weighing in favor of a sentence reduction when assessing a motion for reduction under JUVRA. He reasons that because the limited culpability of juveniles was, in part, JUVRA's impetus, the circuit court was required to weigh the first factor in his favor.

The State disagrees and argues that the plain language and the structure of CP § 8-110 reflects that the General Assembly intended for the circuit court to consider a movant's age on an individualized (as opposed to a categorical) basis. The State points out that the General Assembly has accounted for youth categorically in two ways through CP § 8-110. The first way is through the statute's eligibility requirements. That is, the movant must be someone who "was convicted as an adult for an offense committed when the individual was a minor" for the court to consider a sentence reduction.  CP § 8-110(a)(1). The second way, according to the State, is the tenth factor, which requires the court to consider "the diminished culpability of a *juvenile as compared to an adult*, including an inability to fully appreciate risks and consequences." CP § 8-110(d)(10) (emphasis added). By contrast, argues the State, the age factor under CP § 8-110(d)(1) is individualized and entirely case specific.

In considering the parties' contentions, we apply our principles of statutory interpretation:

> Our goal is to ascertain and effectuate the intention of the legislature and we begin that exercise by reviewing the statutory language itself. We read the plain meaning of the language of the statute as a whole, so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless

26

or nugatory. Additionally, we neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with forced or subtle interpretations that limit or extend its application. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resorting to other rules of construction.

*Woodlin v. State*, 484 Md. 253, 279–80 (2023) (emphasis omitted) (quoting *Comptroller of Md. v. FC-GEN Operations Invs. LLC*, 482 Md. 343, 379–80 (2022)).

We start with the recognition that it is CP § 8-110(c) that prescribes the ultimate criteria governing whether a movant is entitled to receive a reduced sentence: that the movant is not a danger to the public and that the interests of justice will be better served by a reduced sentence. Only if those criteria are met is a movant entitled to a reduced sentence.[21] The factors listed in CP § 8-110(d)—while required to be "consider[ed]" in every case—are the guideposts to assist the circuit court in determining the inquiry

---

[21] The State argues that the ultimate grant of CP § 8-110 relief is purely discretionary because the General Assembly "has not mandated any conditions on which relief *must* be granted." From a purely linguistic standpoint, there is force to that argument, as CP § 8-110(c) states that a court "may" reduce a sentence if subsection (c)'s two criteria are satisfied. And while some statutes are subject to such an interpretation, others, we have held, cannot plausibly be read in such a fashion. *Contrast Woodlin*, 484 Md. at 268–69 (noting that CJP § 10-923 contained two levels of discretion and that, even if the State satisfied its burden for the introduction of certain propensity-based evidence, a circuit court still retained the discretion not to admit that evidence), *with Balt. Police Dep't v. Open Justice Balt.*, 485 Md. 605, 651 (2023) (noting that, under § 4-206(e)(2)(ii) of the General Provisions Article, once a custodian of agency records determines that a waiver of a fee for producing copies of records is in the public interest, the custodian has no discretion not to waive the fee, despite the presence of the word "may"). We agree with Mr. Trimble that if a circuit court determines that the criteria in CP § 8-110(c) have been satisfied—including that a reduction of sentence would serve the interests of justice—the circuit court has no discretion to nevertheless deny a movant a reduction of sentence. *See Open Justice Balt.*, 485 Md. at 651.

presented under subsection (c). CP § 8-110(d) is silent regarding the weight that a court must give to any particular factor in its dangerousness and interests-of-justice analysis. That silence indicates that the factors listed in subsection (d) are intended to provide a circuit court maximum flexibility in considering each factor.

Turning to Mr. Trimble's argument concerning the first factor—CP § 8-110(d)(1)—we disagree that the plain language or the statutory scheme support his argument that the court must consider an individual's age as a factor weighing in favor of a sentence reduction in all cases. By using the phrase "the individual" in subsection (d)(1), the General Assembly is referring to the specific individual who is seeking relief—as distinct from a "juvenile" generically, as referenced in subsection (d)(10). Equating the two provisions would effectively omit the language "at the time of the offense" from CP § 8-110(d)(1) because all eligible movants were juveniles at the time of the offense. Moreover, given the juvenile eligibility requirements under subsection (a)(1), as well as the diminished culpability factor set forth in (d)(10), there would be no point in the General Assembly including an age factor if consideration of that factor was required to always weigh in favor of a sentence reduction. Mr. Trimble's interpretation of factor one—that age is a categorical assessment instead of an individual one—would render factor ten redundant or surplusage.

We further determine that interpreting the first factor through an individualized lens is consistent with the statutory scheme, which requires the court to look at the movant's life circumstances, including their age, at the time of the offense. Notably, the eighth factor uses similar language in that it requires courts to consider the movant's community and family circumstances "at the time of the offense." These factors are case-specific and taken

28

together, inform the court's understanding of the individual's life when the offense occurred.

This plain language interpretation of the first factor, which allows the court to consider the movant's age at the time of the offense, is also consistent with the broad discretion that the General Assembly has conferred on the court in making its ultimate decision under CP § 8-110(c). In the exercise of its discretion, the court may consider how an individual's age at the time of the offense should be viewed with respect to the criteria under CP § 8-110(c)

In his briefs and argument, Mr. Trimble asserts that the court may not treat an individual's age at the time of the offense as an "aggravating factor." To the extent that Mr. Trimble's point is that a court should not be able to treat the age of an individual who committed an offense as a juvenile as a factor weighing *against* a sentence reduction, Mr. Trimble misunderstands the statutory scheme. Under CP § 8-110(d), the General Assembly simply has required a circuit court to consider the enumerated factors—there is no requirement that the court *weigh* those factors in any particular manner, individually or against each other, nor has the General Assembly required the circuit court to indicate how the court views those factors in relation to the inquiry under subsection (c). The circuit court simply is required to *consider* the factors under subsection (d), and the circuit court's written decision simply must reflect that consideration.[22] The circuit court's resolution of

---

[22] We agree with Mr. Trimble, however, that a court could not create a bright line rule in which it would *never* grant a motion for reduction of sentence under *any* circumstance where a movant was a certain age at the time of the offense. Such a categorical exclusion would be inconsistent with the purpose and plain language of the

29

a JUVRA motion is the epitome of a case-specific decision. As such, no two circuit court judges are likely to view in exactly the same manner a particular constellation of the factors contained in CP § 8-110(d). Thus, we expect that different judges will use different terms to express their consideration, as required under CP § 8-110(d).

Accordingly, we hold that under the plain language of CP § 8-110(d)(1), the General Assembly requires the court, when exercising its discretion under CP § 8-110(c), to consider the movant's age at the time of the offense (as well as all other required factors) in order to inform the court's dangerousness and interests-of-justice analysis.

Turning to Mr. Trimble's case, the court stated that the first factor weighed against a sentence reduction. This is functionally equivalent to saying that, in the court's estimation, the age factor did not weigh in favor of supporting the ultimate conclusion (under CP § 8-110(c)) that Mr. Trimble did not pose a danger to society and that the interests of justice would be served by a reduced sentence. As discussed above, a circuit court is not required to conclude in every case that the age factor weighs in favor of a sentence reduction. As a result, we determine that the court did not err in its application of this factor.

Indeed, we discern no error in any respect in how the circuit court articulated its findings. When the court began its substantive analysis, it wrote the heading "APPLICATION OF THE STATUTORY FACTORS" and then addressed and considered,

---

statute—which grants all eligible movants who were juveniles at the time of the offense a meaningful opportunity for a sentence reduction based upon an individualized assessment of dangerousness to the public and the interests of justice upon consideration of the enumerated factors.

as required by CP § 8-110(d), each factor with a separate subheading.[23] The memorandum opinion concluded by applying the appropriate standard, here, answering whether the court was persuaded under CP § 8-110(c) that Mr. Trimble no longer is a danger to society and that the interests of justice would be better served by a reduced sentence. The opinion *considered* every required factor under CP § 8-110(d) and then *concluded* under CP § 8-110(c) that (1) "Mr. Trimble continue[d] to present a substantial risk to the public if released[]" and (2) "the interests of justice would certainly not be served by ordering a reduced sentence[]" because the public's confidence in the finality of Mr. Trimble's sentence was paramount. In short, the court considered each factor in its written ruling and explained its determination under CP § 8-110(c). That was all it was required to do.

## C. *In the Exercise of Its Discretion Under CP § 8-110(c), the Circuit Court Is Not Required to Give Greater Weight to Any Particular Factor Under Subsection (d)*

Mr. Trimble next alleges that the circuit court committed legal error by failing to give greater weight to the fifth factor—evidence of his "maturity, rehabilitation, and fitness to reenter society[.]" CP § 8-110(d)(5). Mr. Trimble believes that the fifth factor *must* be given more significant weight than the remaining factors because such an interpretation gives effect to the General Assembly's intent of ensuring that certain individuals have a meaningful opportunity to demonstrate maturity and rehabilitation in the hopes of

---

[23] While CP § 8-110(e) requires that the circuit court address each of the statutory factors in a written decision, it neither requires any particular structure for the opinion, nor requires the circuit court to address the factors in any particular order. The decision simply must "address" all the statutory factors, *id.* § 8-110(e)(2), and conclude by indicating whether the movant is a danger to society and whether the interests of justice will better be served by a reduced sentence, *id.* § 8-110(c).

obtaining a reduced sentence. Mr. Trimble claims support for this interpretation from this Court's opinions in two cases in which we elevated one factor above others in a multi-factor statute: *Davis v. State*, 474 Md. 439 (2021) and *Alston v. Alston*, 331 Md. 496 (1993).

The State posits that Mr. Trimble's approach is contrary to the plain language of CP § 8-110, which does not instruct courts how to weigh the various factors in subsection (d) but rather states that a court must consider the factors, and that this Court's holdings in *Davis* and *Alston* are cabined to the particular facts/circumstances of those cases.

We agree with Mr. Trimble that the General Assembly's enactment of JUVRA will provide a meaningful opportunity for the release of juveniles, consistent with the Supreme Court's opinions in *Graham*, *Miller*, and *Montgomery*. *See Farmer v. State*, 481 Md. 203, 231 (2022) ("It seems quite possible that JUVRA will provide a meaningful opportunity for release for most juvenile offenders serving lengthy sentences, as its sponsors and advocates intended."); *Jedlicka v. State*, 481 Md. 178, 182–83 (2022) ("The General Assembly has . . . for juvenile offenders sentenced as adults, provided another avenue for release of those who can demonstrate maturity and rehabilitation following a substantial period of incarceration."); *Malvo v. State*, 481 Md. 72, 101 (2022) ("Thus, as a general rule, JUVRA is likely to provide the 'meaningful opportunity for release' contemplated by the Supreme Court."). But that is where our agreement with Mr. Trimble ends.

As discussed above, the General Assembly established that under CP § 8-110(c), the criteria for a sentence reduction are public safety *and the interests of justice*, not merely rehabilitation. The enumerated factors in subsection (d) assist the court in making its ultimate determination under subsection (c) and must be considered by the court in its

32

written decision. There is nothing in the text that reflects, however, that the General Assembly intended for a court to weigh the enumerated factors against one another or to give any special consideration to factor five or to *any factor*, or even instructs that a court must weigh the factors, for that matter.

As previously noted, the General Assembly does not define "interests of justice." But Black's Law Dictionary (12th ed. 2024) defines "interests of justice" as "the proper view of what is fair and right in a matter in which the decision-maker has been granted discretion." This open-ended phrase reflects the broad discretion that is vested in the circuit court to determine what is fair and right, provided that in so doing, it considers the enumerated factors. While the court must consider each of the enumerated factors, as well as any other factor the court determines to be relevant, the General Assembly did not direct that a circuit court give special consideration to any individual factor. Elevating one factor over the others is inconsistent not only with the plain language, but also with the structure of CP § 8-110—which places broad discretion in the court to undertake a dangerousness and interests-of-justice analysis of what is essentially a sentencing-related proceeding.

In the absence of any textual support for his argument that the General Assembly intended for factor five to be given greater weight, Mr. Trimble argues that the statutory scheme supports his interpretation. Specifically, Mr. Trimble points out that eligible individuals are entitled to file more than one petition. *See* CP § 8-110(f). Mr. Trimble argues that, with each subsequent filing, "[t]he only factors that are likely to change in three years are those focused on maturity and rehabilitation; those focused on the crime normally won't change at all with the passage of the time." Even were that to be true, it

33

would not alter our analysis of the statutory scheme. Nothing about either the statutory language or logic suggests that a factor that might remain the same when considered in connection with multiple petitions bears diminished importance compared to other factors.

Moreover, Mr. Trimble is incorrect. In our view, there are several factors that can serve as grounds for new and evolving information between a motion under CP § 8-110 and a subsequent filing three years later. For example, factor three requires a circuit court to assess whether the movant has substantially complied with the rules of the institution in which they are housed. A movant's compliance with institutional rules certainly can improve or worsen over the course of three years. Factor six (a statement from a victim or victim's representative) is a factor that could have been completely absent in the prior CP § 8-110 motion that exists in the current one. It is an exceptionally difficult and emotional task to discuss or relive one's trauma, and there are myriad reasons why a victim or a victim's representative may not have participated in a prior CP § 8-110 hearing. With the passage of time, a victim or victim's representative could become more sympathetic to a movant's request for a sentence reduction. Factor seven (any report of a physical, mental, or behavioral examination of the individual conducted by a health professional) also can change within three years. Lastly, under factor eleven, which serves as a catchall, the court can consider any new and relevant factors that perhaps were missed or not present in prior proceedings. Thus, Mr. Trimble's interpretation would have this Court freeze in time the status of a movant at the time they file their first motion under CP § 8-110 and assume that the only factor that can fluctuate is the movant's maturity and rehabilitation. That overlooks

34

the possibility of other evolving factors contained in CP § 8-110(d), as we note above, that can improve or worsen between the filing of a second and third motion under CP § 8-110.

Finally, we are unpersuaded that *Alston* and *Davis*—cases involving different statutes than CP § 8-110—support Mr. Trimble's statutory interpretation that the fifth factor is required to be given greater weight. In *Alston*, this Court assessed the propriety of a circuit court's marital property monetary award under the Family Law Article ("FL").[24] 331 Md. at 498. A husband and wife married in 1964 and separated in 1985. *Id.* at 500. The wife filed a complaint for absolute divorce in 1987, wherein she alleged that the two had been separated for over a year and disclaimed any alimony or a monetary award. *Id.* Before the 30-day window for the husband to answer elapsed, he purchased a winning D.C. lottery ticket, which had an annuitized value of over $1 million. *Id.* at 501. The wife subsequently dismissed her pending complaint for divorce and, six months later, filed a new complaint alleging adultery and seeking a monetary award. *Id.* Both parties agreed that the proceeds of the winning lottery ticket were marital property (because it was

---

[24] FL § 8-205(a)(1) states:

> Subject to the provisions of subsection (b) of this section, after the court determines which property is marital property, and the value of the marital property, the court may transfer ownership of an interest in property described in paragraph (2) of this subsection, grant a monetary award, or both, as an adjustment of the equities and rights of the parties concerning marital property, whether or not alimony is awarded.

Subsection (a)(2) lists out the type of property in which the court may transfer ownership. FL § 8-202(b) then requires courts, much like CP § 8-110(d), to consider 10 enumerated factors along with any other factor the court deems "necessary or appropriate . . . to arrive at a fair and equitable monetary award." FL § 8-202(b)(11).

acquired before the marriage expired) but disagreed over whether a monetary award was proper. *Id.* at 502. Ultimately, the circuit court made a monetary award to the wife equal to half the value of the combined marital assets, which included the value of the lottery ticket. *Id.* at 503.

On appeal, this Court recognized that the statutory factors in FL § 8-202(b) "are not prioritized in any way, nor ha[d] the General Assembly mandated any particular weighing or balancing of th[os]e factors." *Id.* at 507. Nevertheless, we held that the eighth factor—assessing how and when specific marital property was acquired—"should be given *considerable weight*." *Id.* (emphasis added). That holding was based on FL § 8-202's "history and purpose[.]" *Id.* Such history and purpose, this Court noted, showed that the "General Assembly was primarily concerned with achieving equity[—not merely equality—] by reflecting non-monetary contributions to the acquisition of marital assets, and [that] this principle should be a major consideration in a trial judge's analysis." *Id.* at 506–07. While the Court announced no bright-line rule, it emphasized that "each case must depend upon its own circumstances to [e]nsure that equity be accomplished[.]" *Id.* at 507. Therefore, "in a case such as th[at one,] the eighth factor should [have] be[en] given greater weight than the others." *Id.* Applying this analysis, the Court held that the circuit court did not properly consider the eighth factor and vacated and remanded. *Id.* at 507–09.

In *Davis*, this Court answered what the word "amenability" means under CP § 4-202(d), the statute that lists factors for a court to consider in determining whether to grant

a reverse juvenile waiver,[25] and how the five factors in that statute relate to one another. 474 Md. at 451, 464–66. The five factors outlined in CP § 4-202(d) are: (1) the age of the child, (2) the mental and physical condition of the child, (3) the amenability of the child to treatment in an institution, facility, or program available to delinquent children, (4) the nature of the alleged crime, and (5) public safety. We ultimately concluded that "[t]he five considerations are not in competition with one another. They all must be considered but they are necessarily interrelated and, analytically, they all converge on amenability to treatment[, the third factor.]" *Id*. at 464. We discussed how each of the other four factors have some bearing on amenability. *Id.* at 464–66. We held that the circuit court did not properly "consider amenability—*the ultimate determinative factor that takes into account each of the other four factors*[.]" *Id.* at 466 (emphasis added).

In Mr. Trimble's view, *Alston* and *Davis* "exemplify the proper approach to construing multi-factor statutes to effectuate the legislative intent." He believes that even though both statutes at issue in those cases were silent as to how the factors should have been weighed, "this Court [nevertheless] ascertained the legislative intent and provided guidance on the relative importance [that] circuit courts should give the factors to effectuate th[eir] intent." *Alston* and *Davis* cannot bear the weight that Mr. Trimble places upon them.

As noted above, in *Alston*, there was a preamble purpose statement and legislative history directly on point. In *Davis*, there was a purpose provision that informed our

---

[25] A reverse waiver is a "transfer of jurisdiction by the [circuit] court to the juvenile court where the alleged crime carried a penalty of death or life imprisonment." *Davis*, 474 Md. at 454.

statutory interpretation. Here, there is no purpose provision, statutory language, or legislative history that either states or addresses Mr. Trimble's proposition that rehabilitation evidence must be the "ultimate determinative factor" in relation to the ultimate findings required under CP § 8-110(c), and the ten enumerated factors under (d). In conclusion, we hold that there is nothing in the plain language, or the statutory scheme to support Mr. Trimble's assertion that the General Assembly intended a court to give greater weight to the fifth factor. To the contrary, such an interpretation would be inconsistent with the plain language of subsection (c), which requires that the court make an ultimate determination on the dual findings of dangerousness and the interests of justice, the latter of which encompasses more than simply rehabilitation.

**D.** ***The Circuit Court Did Not Abuse Its Discretion in Denying Mr. Trimble's Motion for Reduction of Sentence***

For his final allegation of error, Mr. Trimble contends that the circuit court "fundamentally misunderstood the nature of [ASPD] as permanent and unremitting," and that such a misunderstanding "pervaded the court's decision." More specifically, Mr. Trimble alleges that the court erred by making comments in its analyses of factors two, five and seven, which indicate the court's view that Mr. Trimble's diagnosis of ASPD is incapable of rehabilitation/remission. In Mr. Trimble's view, "[i]t is no answer to say . . . that the circuit court's general discretion to make credibility determinations permitted it to credit [parts of sources] that supported its decision and disbelieve those parts that contradicted it." Mr. Trimble asserts that "[t]he problem with this position is that it overlooks the very reason the circuit court could consider [these sources] in the first place:

38

the doctrine of judicial notice." According to Mr. Trimble, that doctrine does not authorize the court to "cherry-pick[]" the evidence and "virtually ignore a mountain of evidence of rehabilitation."

The State principally argues that the court—as the fact finder—is vested with broad discretion to credit (or not) the evidence related to Mr. Trimble's diagnoses and that the court did not commit legal error.

As discussed above, we accept the court's first-level findings unless they are shown to be clearly erroneous. *Longshore*, 399 Md. at 498. We agree with the Appellate Court that the circuit court, as the factfinder in this case, was vested with the discretion to evaluate the evidence as it saw fit. *See Trimble*, 262 Md. App. at 471–72. A circuit court sitting as a factfinder, like a jury, is "free to believe some, all, or none of the evidence presented[.]" *Sifrit v. State*, 383 Md. 116, 135 (2004). And that is exactly what occurred here. The court correctly stated that it was "entitled to believe all, part[,] or none of Dr. Means' opinion[,]" noting that the court did "not credit any suggestion that [Mr. Trimble's] upbringing was a cause of [his] psychopathy or sociopathy." Instead, the court believed that Mr. Trimble's ASPD diagnosis "is organic and incurable[]" and that it was "not logically possible to conclude that someone diagnosed with [ASPD] . . . has mystically gotten better over time."

The court reached that determination primarily by crediting other expert testimony in the record. For example, the circuit court noted that every medical expert involved in Mr. Trimble's underlying case (including Dr. Means) has confirmed Mr. Trimble's original ASPD diagnosis at age 18. One of these experts, Dr. Lehman, stated in his report that "much of [Mr. Trimble's] impulsive and antisocial behavior is . . . egosyntonic. Guilt and

remorse is not a part of Mr. Trimble's personality." Another expert, Dr. Spodak, testified

at Mr. Trimble's original sentencing proceeding that this lack of guilt and remorse "are the

kind of things that [lead him] to conclude that, given the opportunity, Mr. Trimble would

repeat this behavior without the slightest hesitation, because he doesn't think . . . that there

is anything wrong with it[.]" When questioned whether ASPD "can be altered by

treatment," Dr. Spodak opined that it was "very unlikely, if possible at all, that it could

ever be altered by therapy" because it is "so deeply ingrained and [is] just basically a style

of living." This testimony aligned with Dr. Means' own report, which acknowledged that

ASPD is "typically" a "set, pervasive diagnosis that has little resolution." The circuit court

relied on this and other expert testimony in the record in concluding that it "was not

persuaded that [Mr.] Trimble's [ASPD] ha[d] remitted significantly or that, if it ha[d], the

risk of extraordinary violence has been abated."[26]

---

[26] To be sure, the circuit court's analysis also refers to sources outside the record. The court listed the "diagnostic criteria" for ASPD that are contained in the DSM-5-TR and noted that a "modern authorit[y]" stated that, "[f]or most people[, ASPD] is a chronic disorder that begins in early childhood and continues throughout adulthood." (Quoting Donald W. Black, *The Natural History of Antisocial Personality Disorder* at 8 (2015) (https://www.nebi.mlm.hih.gov)). Mr. Trimble faults the court for taking "judicial notice" of these sources, only to then partially credit those sources. There is no force to that argument for two reasons. *First*, as a factual matter, nowhere in the court's memorandum opinion did it indicate that it was taking judicial notice of any evidence outside the record. *Second*, read in context, the quotes from these sources do not indicate that the court credited some of the information in those sources over other information. Rather, the quotes serve to summarize or bolster the expert testimony that the court credited over some of the testimony given by Dr. Means. For example, Dr. Spodak testified that the version of the DSM-5-TR in use at that time "is helpful in terms of setting the criteria for the diagnosis" of ASPD. Additionally, the article simply "agree[d]" with what the court understood the conclusions of Dr. Spodak and Dr. Lehman to be, namely, that ASPD "is so deeply ingrained that rehabilitation/remission does not ordinarily occur."

In reaching that permissible conclusion, the circuit court did not fail to consider Mr. Trimble's rehabilitative efforts. To the contrary, the court noted that Mr. Trimble "has substantially complied with the rules of the Divisions of Corrections" and obtained high school and college degrees while incarcerated. Despite these rehabilitative efforts, the court determined that Mr. Trimble was not fit to reenter society, particularly given Mr. Trimble's request—at nearly age 40—to exhume Ms. Rogers' body for DNA testing.

This determination was also based on the nature of the offense, which the court identified as "one of the most brutal, savage crimes in the modern history of cases tried in the Circuit Court for Baltimore County[;]" the victim impact statement, which conveyed that Mr. Trimble's crimes "had a deep, life changing impact on the family of Nila Rogers[;]" and Mr. Trimble's "leading role" in the offense. While the circuit court may not have discussed Mr. Trimble's rehabilitative efforts in as much depth as Mr. Trimble would have liked, that does not mean that the court dismissed/ignored those efforts, thereby violating CP § 8-110(d).

So long as the circuit court adhered to CP § 8-110's requirements, it had the discretion to credit all, part, or none of the evidence regardless of the source and to assess the evidence as it saw fit. Reading the court's written decision in its entirety demonstrates that the court adhered to those requirements. The court adequately considered each of the ten enumerated factors in CP § 8-110(d) and "clearly state[d] the critical facts and reasons supporting its dangerousness and interests-of-justice analyses, and those facts and reasons are supported by the record[.]" *Bishop*, 310 A.3d at 648. Under these circumstances, we

cannot say that the circuit court abused its discretion in denying Mr. Trimble's motion for sentence reduction.

## V
## CONCLUSION

We hold that, in evaluating a motion filed under CP § 8-110, the circuit court has broad discretion to determine whether an individual is a danger to the public and whether the interests of justice will be served by a reduced sentence. When exercising its discretion under CP § 8-110(c) and undertaking its dangerousness and interests-of-justice analysis, the court may consider the movant's age at the time of the offense, in conjunction with the other evidence of record, and consider that factor however it so chooses. In other words, the circuit court is not required to consider an individual's age at the time of the offense positively when assessing the criteria under CP § 8-110(c). When undertaking its dangerousness and interests-of-justice analyses under CP § 8-110(c), although the court is required to consider the ten enumerated factors under CP § 8-110(d), as well as any other factor the court determines is relevant, the statute does not require that the court give special consideration to any particular factor, use any particular words in assessing the significance of the factors, or consider the factors in any particular order.

Concerning Mr. Trimble's case specifically, the circuit court did not abuse its discretion when it (1) stated that Mr. Trimble's age at the time of the crime (nearly 18 years old) weighed against his request for a reduced sentence; (2) adequately considered all factors under CP § 8-110; and (3) credited some expert testimony about ASPD over other expert testimony in determining that Mr. Trimble's ASPD diagnosis is one reason why he

42

is not sufficiently fit to reenter society. In this case, the record reflects that the court carefully considered all the evidence presented by both parties when evaluating the mandatory factors under CP § 8-110 and concluded that "the interests of justice would certainly not be served by ordering a reduced sentence."

Finding no error, we affirm the Appellate Court.[27]

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED. PETITIONER TO PAY COSTS IN THIS COURT.**

---

[27] While the motions judge indicated in his memorandum opinion that Mr. Trimble's motion to correct an illegal sentence "was withdrawn by [Mr.] Trimble because the [General Assembly] enacted [JUVRA,]" the relevant order, as indicated earlier, stated that the court would "RESERVE on th[at] Motion, and Order[ed] that any further or other Motions filed in this action will be heard and decided by the [motions judge]." Thus, Mr. Trimble's motion to withdraw his motion to correct an illegal sentence remains pending in the circuit court. Additionally, Mr. Trimble has the right to file additional motions under CP § 8-110 in the future. In denying relief on this petition, the motions judge stated that "[t]his is a case where the sentence should never be disturbed." Because a reasonable person could understand that statement to reflect prejudgment of the merit of future filings, the motion to withdraw Mr. Trimble's motion to correct an illegal sentence and any subsequent motion filed under CP § 8-110 should be assigned to a different judge in the Circuit Court for Baltimore County. Prejudgment of future petitions contravenes fairness and impartiality—foundational bedrocks of jurisprudence.

IN THE SUPREME COURT

OF MARYLAND

No. 28

September Term, 2024

---

JAMES RUSSELL TRIMBLE

v.

STATE OF MARYLAND

---

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves
Killough

JJ.

---

Concurring Opinion by Fader, C.J., which
Booth, J., joins.

---

Filed: July 17, 2025

Respectfully, I concur. I agree with the judgment and with much of the analysis in the Majority opinion. I write separately for two reasons.

The first is a comment on the terminology used to describe a circuit court's role in determining whether a petitioner has satisfied the two criteria in § 8-110(c) of the Criminal Procedure Article (2018 Repl., 2024 Supp.): "(1) the individual is not a danger to the public[] and (2) the interests of justice will be better served by a reduced sentence." I agree with the Majority that in identifying 10 required considerations and an eleventh catch-all category of "any other factor the court deems relevant," the General Assembly intended "to confer broad discretion on the court to consider *any* matter as long as it is relevant to the ultimate determination in granting a sentence reduction[.]" Maj. slip op. at 25. I further agree that the absence of any instruction as to how circuit courts are to weigh the factors in a particular case demonstrates a legislative intent "to provide a circuit court maximum flexibility in considering each factor." *Id.* at 27.

But I am somewhat confused by the Majority's distinction between 'considering' factors and 'weighing' them. *See id.* at 29-32. In considering factors, a court is necessarily identifying whether each factor "moves the needle"—i.e., weighs—in favor of or against a reduction in sentence, and if so, by how much. The statute does not command any mechanism for conducting that exercise, including what weight to assign to any particular factors or how to weigh them individually or in relation to each other or in any other way. Those decisions are all left to the court to apply based on the circumstances presented by each petition. But consideration of the factors in that process necessarily involves determining whether, and if so how, they ultimately influence the court's analysis of

whether the individual is no longer a danger to the public and whether a sentencing reduction would be in the interests of justice.

And notwithstanding the significant discretion afforded to circuit courts in considering all relevant factors, that discretion is necessarily bounded in some respects. For example, a court considering "the history and characteristics of the individual," § 8-110(d)(2), could not give weight to impermissible considerations of race or gender. And it would be difficult to envision a court considering "whether the individual has completed an educational, vocational, or other program," § 8-110(d)(4), to be acting within the permissible scope of its discretion if it treated the successful completion of an advanced degree in nursing as weighing heavily against a reduced sentence.

One constraint on the broad discretion of circuit court judges in applying the § 8-110(d) factors is that they cannot be applied so as to undermine a clear legislative purpose underlying § 8-110. That leads me to the second reason for this concurrence, which is to explain why I conclude that a court conducting the analysis required by § 8-110 of the Criminal Procedure Article cannot consider an individual's age at the time of the offense as a factor weighing against a reduction in sentence. I believe the better interpretation of the statute is that that factor can either weigh in favor of a reduction in sentence to varying degrees or it can be neutral. I nonetheless join the Majority's judgment because I agree that, in context, the circuit court's statement at issue here is best interpreted as meaning that "the age factor did not weigh in favor of supporting the ultimate conclusion (under CP § 8-110(c)) that Mr. Trimble did not pose a danger to society and that the interests of justice would be served by a reduced sentence." Maj. slip op. at 30. I do not

2

think the court here treated Mr. Trimble having been 17 at the time of the offense as the equivalent of an "aggravating factor."

The Juvenile Restoration Act ("JUVRA") was enacted in the wake of developments in psychology and brain science—as expressed by the United States Supreme Court in a series of decisions in the context of the Eighth Amendment[1]—reflecting that juveniles have diminished culpability at the time of their criminal conduct and are more capable of rehabilitation, and therefore, must be afforded "some meaningful opportunity to obtain release [from incarceration] based on demonstrated maturity and rehabilitation." *Graham v. Florida*, 560 U.S. 48, 75 (2010).

The opportunity to file a JUVRA petition for a reduced sentence is available only to individuals who committed their offenses as juveniles. Md. Code Ann., Crim. Proc. § 8-110(a)(1) (2018 Repl., 2024 Supp.). That represents a legislative judgment about the appropriate age to use as a cutoff point for this potential benefit: 18. That judgment is further reflected in the tenth factor in § 8-110(d): "the diminished culpability of a juvenile as compared to an adult, including an inability to fully appreciate risks and consequences." *Id.* § 8-110(d)(10). That factor reflects the General Assembly's judgment that minority age inheres diminished culpability, and accordingly it instructs the court to consider "the"

---

[1] *See Graham v. Florida*, 560 U.S. 48, 75 (2010) (holding that the Eighth Amendment prohibits a sentence of life without parole for non-homicide juvenile offenders and requires non-homicide juvenile offenders to have a meaningful opportunity to obtain release from incarceration); *Miller v. Alabama*, 567 U.S. 460, 479 (2012) (holding that the Eighth Amendment prohibits mandatory sentences of life without parole for juvenile offenders); *Montgomery v. Louisiana*, 577 U.S. 190, 208-09, 212 (2016) (holding that *Miller* announced a substantive rule of constitutional law and therefore applied retroactively).

diminished culpability of "a" juvenile, not whether this movant's juvenile status afforded such diminishment.[2] It is inconsistent with the expression of factor (d)(10) to permit "the individual's age at the time of the offense," *id.* § 8-110(d)(1)—necessarily below 18—to weigh against a sentence reduction.

Of course, there is still work to do for the individualized determination required by factor (d)(1), beyond consideration of the generalized judgment reflected in factor (d)(10). A court might view younger juvenile offenders as even less culpable and even more capable of rehabilitation than older juvenile offenders. Accordingly, a court might conclude that factor (d)(1) weighs more heavily in favor of a sentence reduction in a case involving a younger juvenile offender than the same court might when considering the case of an older juvenile offender. And as an individual's age at the time of the offense gets closer to the age of majority, as was the case here, a court might decide to treat that factor as neutral, recognizing a lack of a meaningful difference in age between that individual and someone just on the other side of 18 at the time of an offense. But I think it would be contrary to the clear legislative purpose reflected in JUVRA to treat the age of an individual

---

[2] That categorical recognition is also reflected in United States Supreme Court jurisprudence. *See Roper v. Simmons*, 543 U.S. 551, 571 (2005) ("Once the diminished culpability of juveniles is recognized, it is evident that the penological justifications for the death penalty apply to them with lesser force than to adults."); *Miller*, 567 U.S. at 471 ("[C]hildren are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, . . . 'they are less deserving of the most severe punishments.'" (quoting *Graham*, 560 U.S. at 68)).

who was 17 or younger at the time they committed an offense as a factor weighing against a reduction of a sentence that is "at least 20 years."[3]

Justice Booth advises that she joins this concurring opinion.

---

[3] *See* Crim. Proc. § 8-110(a)(3) (stating that the statute "applies only to an individual who," in addition to having been convicted for an offense committed as a minor before October 1, 2021, "has been imprisoned for at least 20 years for the offense").

Circuit Court for Baltimore County
Case No. 74841
Argued: February 6, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 28

September Term, 2024

---

JAMES RUSSELL TRIMBLE

v.

STATE OF MARYLAND

---

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves
Killough

JJ.

---

Concurring Opinion by Killough, J.

---

Filed: July 17, 2025

I concur in the judgment affirming the circuit court's denial of Mr. Trimble's petition for sentence reduction under the Juvenile Restoration Act ("JUVRA"), codified at Md. Code Ann., Crim. Proc. ("CP") § 8-110 (2018 Repl. Vol., 2024 Supp.). I agree that the circuit court did not abuse its discretion in concluding that Mr. Trimble had not demonstrated sufficient rehabilitation, maturity, and reduced risk to public safety to warrant relief at this time. I write separately, however, to express concern about aspects of the circuit court's reasoning that, while not necessarily outcome determinative here, may undermine confidence in the JUVRA process for Mr. Trimble going forward.

*Improper Use of Extra-Record Authority*

The circuit court cited an article by Dr. Donald W. Black, *The Natural History of Antisocial Personality Disorder*, 60 Can. J. Psychiatry 309 (2015) ("Dr. Black's Article"), *available at* https://perma.cc/97Z5-6NX2. Neither party cited this article, and there is no indication that it was admitted into evidence or subjected to adversarial scrutiny.[1] The circuit court used Dr. Black's Article to support the broad assertion that Antisocial Personality Disorder ("ASPD") is "so deeply ingrained that rehabilitation/remission does not ordinarily occur," and that "[f]or most people, [it] is a chronic disorder that begins in early childhood and continues throughout adulthood."

---

[1] Although the Majority observes that the circuit court did not take judicial notice of Dr. Black's Article, Majority Op. at 40 n.26, the circuit court's written opinion nonetheless cites it as a basis to deny relief. Whether labeled "judicially noticed" or not, Dr. Black's Article remained undisclosed, untested hearsay and Mr. Trimble was denied an opportunity to challenge its findings or present rebuttal evidence from his expert.

Upon further inspection, however, Dr. Black's Article presents a far more nuanced picture of the science of ASPD remission than the trial judge's broad characterization suggests. Dr. Black's Article, in fact, states that "[w]hile it is clear that the disorder is chronic for most, we have little understanding of how or why some improve, while others do not." *Id.* at 313. Dr. Black explains that although "problems continue, though on a lesser scale," there is a consistent pattern of improvement that "can occur at any age, but it most likely starts between the mid-30s and early 40s." *Id.* Dr. Black's Article further notes that researchers "found that a sizable percentage of people with ASPD improve or remit with advancing age[,]" and that this finding aligns with crime statistics, which show that "arrests peak among people in their late teens and then decline." *Id.* (footnotes omitted). This was the position taken by Mr. Trimble's expert, Dr. Ronald Means, who opined that:

> It is not necessary to speculate on Mr. Trimble's rehabilitative potential. He has now been in prison for almost forty years, and his positive course is apparent. At the onset of his incarceration, he changed his behaviors and avoided connection to problematic inmates or engagement in recurrent criminality. Alternatively, he earned his GED and college degree and held stable work positions. He has done all possible to rehabilitate himself thus demonstrating that he is not incorrigible.

I do not believe that circuit court judges should introduce extra-record materials into a legal proceeding, especially at its conclusion, particularly where, as in this case, the proceeding involved a defendant's liberty. The State did not present any evidence from Dr. Black or from any other expert who examined Mr. Trimble for purposes of the JUVRA hearing to counter the defense's expert, Dr. Means. Generally, a trial judge should refrain from relying on facts that are not included in the record. *See Massey v. State*, 173 Md. App. 94, 125 (2007).

*Improper Commentary on Finality and Future Petitions*

The circuit court also wrote in its decision that:

> While the interests of justice sometimes require the application of sentencing lenity and sometimes require sentencing mercy, public confidence in the justice system also depends upon reassurance to the community that certain sentences must be final, and they must stand. This is a case where the sentence should *never* be disturbed.

(emphasis added). This is problematic in my view. Any future JUVRA petition filed by Mr. Trimble is not this judge's decision to make — not at this hearing, and not in this context. JUVRA allows eligible individuals to file up to three petitions for sentence reduction. *See* CP § 8-110(f). The General Assembly explicitly designed this process to be revisited over time. The circuit court's pronouncement that the sentence "should never be disturbed" conflicts with the structure and spirit of the statute. Courts must consider each petition on its merits, based on the record before them at that time — not freeze the statute's operation with conclusory declarations about finality.

Judges should avoid language that suggests a predisposition against certain categories of cases or litigants. In my view, the circuit court judge's statement that Mr. Trimble, in effect, should never be granted JUVRA relief, is unfortunate. Such commentary raises concerns about impartiality and risks discouraging individuals from pursuing legal remedies to which they are entitled. The principles of judicial neutrality and fair access to the courts require vigilance against statements that may chill the legitimate exercise of statutory rights. This safeguard is especially critical in proceedings, like those under JUVRA, that contemplate evolving circumstances and allow for repeated judicial review.

As mentioned above, I do not believe the circuit court judge's actions were outcome determinative. However, JUVRA is designed to provide a "meaningful opportunity" for release, based on several factors including demonstrated maturity and rehabilitation, and our jurisprudence strongly discourages judicial imputations of bias or personal beliefs when a defendant presents relevant evidence. I agree completely with the majority's observation that "any subsequent motion filed under CP § 8-110 should be assigned to a different judge in the Circuit Court for Baltimore County." Majority Op. at 43 n.27.

I therefore respectfully concur.